# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHALIECIA WILLIAMS, an Individual, S.W., a minor by and through her Guardian Ad Litem, SHALIECIA WILLIAMS, an Individual,<br><br>Plaintiffs,<br><br>v.<br><br>CAMDEN USA, INC. a Delaware Corporation; CAMDEN OLD CREEK, a Business Form Unknown; and DOES 1-10,<br><br>Defendants. | Case No.: 3:19-cv-00691-AJB-AHG<br><br>**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT** |

In this action plaintiffs Shaliecia Williams, individually and as Guardian Ad Litem for S.W., a minor (collectively "Plaintiffs"), allege racial discrimination by Defendant Camden USA, Inc. ("Defendant"). Defendant filed a motion to dismiss Plaintiffs' First Amended Complaint ("FAC") for failure to state a claim as to all claims. (Doc. No. 10.) Plaintiffs opposed, (Doc. No. 13), and Defendant replied, (Doc. No. 14). For the reasons stated below, the Court **GRANTS** Defendant's motion with leave to amend.

///

///

1

# I. BACKGROUND

Plaintiff Shaliecia Williams ("Williams")[1], an African-American woman, and her minor daughter, S.W. ("S.W."), are tenants in the Camden Old Creek apartment complex located at 1935 Northstar Way, San Marcos, California 92078 ("Property"). (Doc. No. 8 ¶¶ 1, 4, 13.) The Property is owned by Camden USA, Inc., which Plaintiffs allege has employed Camden Old Creek to manage the Property since December 2002.[2] (*Id*. ¶¶ 5–6.) Plaintiffs moved into the Property in February of 2014 and lived there with no issues until mid-2018. (*Id*. ¶¶ 10, 11.) In or around January 2018, Defendant employed Anna Rzepka ("Rzepka") as the resident manager of the Property. (*Id*. ¶ 12.) Rzepka has since remained resident manager. (*Id*.) Plaintiffs allege Rzepka is Latin, and possibly Caucasian. (*Id*. ¶ 13.)

## A. Factual Background

Plaintiffs allege nine separate instances as the factual basis for their claims. Plaintiffs allege that Defendant has a policy which allows residents to use a printer in the office if necessary. (*Id*.) In July 2018, Williams went into the office at the Property to use the printer and Rzepka asked Williams in a "quizzical, and inappropriate" tone whether Williams lived at the Property. (*Id*.)

On August 4, 2018, which was the last day rent was due, Williams paid her rent online. (*Id*. ¶ 14.) The following day, Williams realized she had been charged for three months of rent. (*Id*.) Realizing there was an error, Williams called Rzepka to resolve the problem. (*Id*.) Plaintiffs allege Rzepka spoke to Williams in a condescending tone when Williams inquired as to an overcharge of rent. (*Id*.) Plaintiffs allege Rzepka asked Williams, "How do you say your name?" (*Id*.) After Williams told Rzepka her name, Rzepka asked Williams in an odd way, "What kind of name is that?" (*Id*.) Williams

---

[1] The FAC consistently refers to a single plaintiff, despite there being multiple plaintiffs in this case. (*See generally* Doc. No. 8.) It is clear from the FAC that the singular plaintiff referred to is Williams, not S.W.

[2] In the motion to dismiss, Defendant contends that Plaintiffs erroneously named Camden USA, Inc. as Camden Old Creek. (Doc. No. 10 at 3.)

"responded in a friendly tone, 'A black name.'" (*Id.*) During this conversation, Plaintiffs allege Rzepka informed Williams that she went through Williams' payment history as a resident, and then lectured Williams "in a condescending manner" about waiting until the last day to pay her rent. (*Id.*) Williams responded by questioning Rzepka for checking her rental history. (*Id.*)

Plaintiffs allege Defendant failed to contact Williams before towing her second vehicle, despite it having the required sticker authorizing Williams to park the vehicle at the Property. (*Id.* ¶¶ 15, 16.) Plaintiffs allege Rzepka told Williams she towed the vehicle because "'[i]t sat there for days. This is not the ghetto. It had cobwebs on the car.'" (*Id.* ¶ 16.) Williams refused to pay the towing charge. (*Id.*) Williams reported the incident to Defendant's District Coordinator, Leyna Trinh ("Trinh"), who ultimately agreed to pay the towing charge. (*Id.*)

Plaintiffs allege that for several weeks Rzepka "would stare intently" and in an intimidating manner at 14-year-old S.W. whenever she would go to the pool with her friends. (*Id.* ¶ 17.)

Plaintiffs allege Rzepka deceived Williams to conduct an improper inspection of her unit. (*Id.* ¶ 18–20.) On August 29, 2018, Rzepka emailed Williams indicating that she wanted to do an inspection of Williams' unit. (*Id.* ¶ 18.) Plaintiffs allege the letter referenced California law and referred to a move-out inspection. (*Id.*) Williams responded to the email requesting the inspection be postponed until she moved out as the letter referred to a move-out inspection and Plaintiffs were not yet moving out. (*Id.*) Williams also spoke to someone in the office named Stacy who informed Williams that they had received her email and that it would not be a problem. (*Id.*)

On September 19, 2018, Rzepka emailed Williams about an annual fire alarm test. (*Id.* ¶ 19.) The email indicated that inspection would occur, and that they were going to walk through the unit to make sure they could hear the fire alarm throughout the unit. (*Id.*) The email indicated that the inspection would occur on September 27, 2018. (*Id.*) Despite Williams' request, Defendant refused to accommodate Williams to allow her to be present

3

for the inspection. (*Id.*) Additionally, Plaintiffs allege the 2018 fire alarm inspection had already occurred in March 2018. (*Id.*) When Williams returned home the day of the inspection, she realized that all the drawers and cabinets were open and had been clearly looked at. (*Id.*) After questioning Rzepka about the inspection, Williams learned Defendant conducted a move-out inspection, not a fire alarm inspection. (*Id.*)

On September 27, 2018, upon learning of the deception, Williams reported Rzepka's deception regarding the inspection to Trinh. (*Id.* ¶ 20.) Williams informed Trinh she did not feel comfortable with Rzepka there, and that Rzepka was harassing Plaintiffs. (*Id.*) Williams informed Trinh that Rzepka had harassed Plaintiffs in apparent retaliation for complaining about the car towing incident, that she feared for her and S.W.'s safety, and that Rzepka made her feel "subhuman." (*Id.*)

On September 29, 2018, Trinh called Williams to discuss the incidents raised in the September 27, 2018 email. (*Id.*) During that conversation, Williams told Trinh she would like Rzepka removed as resident manager because of Rzepka's harassment and mistreatment of Plaintiffs. (*Id.*) Trinh told Williams she would speak with her team and get back to her. (*Id.*)

On October 1, 2018, Trinh emailed Williams and offered her the opportunity "'to move out without any lease break penalties or turnover charges.'" (*Id.* ¶ 21.). Plaintiffs allege the email was silent as to any discussions or actions Trinh had taken against Rzepka. (*Id.*)

The following day, on October 2, 2018, Trinh sent another email to Williams informing her that Rzepka would remain the community manager at the complex. (*Id.* ¶ 22.) Trinh again reiterated that Williams was free to move out and break her lease, but that she would be required to decide within three days. (*Id.*) Williams and Trinh exchanged two more emails on October 22, 2018. (*Id.*) After that, Williams had no contact with Rzepka, nor any other of Defendant's employees. (*Id.* ¶ 25.)

On December 5, 2018, Williams received a letter from Defendant's attorney indicating that management reported an "altercation" with Williams, stating that she

"cursed at and scared management team members at the complex." (*Id.* ¶ 26.) Plaintiffs contend these claims were "patently false." (*Id.*) Williams responded to the email, also sending a carbon copy to Trinh, and indicated that the claims were false. (*Id.*) Williams reported the history of harassment she and S.W. had suffered by Rzepka. (*Id.*) The only response alleged occurred the same day and was an automatic email from Trinh indicating that she was out of the office. (*Id.*)

On December 10, 2018, Williams' toilet leaked in the middle of the night and water seeped through the walls and into the unit below Williams. (*Id.* ¶ 27.) Defendant called Williams the next morning to notify her of the issue and repairmen were sent that day to fix the issue. (*Id.*)

On December 15, 2018, repairmen were again sent to fix the issue. (*Id.*) The repairs were done over a two-day period. (*Id.*) At some point during the repairs, one of the workers said to Williams: "'Don't say anything, but your manager was talking very negatively about you. She doesn't like you. She told us that you are black, and you'll go off on her. She told us to watch-out.'" (*Id.*)

On January 15, 2019, Plaintiffs' toilet began to leak again. (*Id.* ¶ 28.) Williams reported the problem at around 9:00 p.m., and two maintenance men immediately came and fixed the issue. (*Id.*) Most of the work was completed in twenty minutes, however, the men needed a vacuum to complete their work. (*Id.*) As such, one of the men went to get a vacuum while the other, Carlos, waited at the apartment with Williams. (*Id.*) After waiting for some time, Plaintiffs allege "Carlos blurted a statement out-of-the-blue, 'I'm sorry that Camden Old Creek is not up to your standards.'" (*Id.*) The comment made Williams uncomfortable, however, she did not say anything. (*Id.*). Finally, Williams informed Carlos that she wanted to postpone the remainder of the work so she could go to sleep. (*Id.*) Carlos refused to leave, stating that they needed to wait. (*Id.*) Williams called Rzepka, who instructed Carlos to leave. (*Id.*)

For the next several months, Williams had no contact with Defendant, or any of its employees. (*Id.* ¶ 29.)

5

3:19-cv-00691-AJB-AHG

Lastly, on April 9, 2019, Defendant sent a 60-day notice to terminate Plaintiffs' tenancy. (*Id.* ¶ 30.) The notice was accompanied by a letter from an attorney indicating that Williams would be evicted if she did not comply with the Notice of Termination. (*Id.*) Williams contacted Trinh via email and requested a reason for termination. (*Id.*) Trinh responded explaining that it was up to the team's discretion about whether to renew a lease. (*Id.*) Williams again responded stating that she was disturbed as she had not done anything wrong that would justify terminating her lease, outlined the wrongs she had previously suffered, and stated that harassment was forcing her to move. (*Id.*) Trinh again responded indicating that she did not believe Williams had done anything wrong, but rather, she believed it was best since Williams did not seem satisfied with her residency. (*Id.*)

### B. Procedural History

On April 16, 2019, Plaintiffs filed their initial complaint with the Court. (Doc. No. 1.) On May 5, 2019, Plaintiffs filed their FAC "as a matter of course," pursuant to Fed. R. Civ. P. 15(a)(1)(A). (Doc. No. 8.) The FAC alleges five causes of action including: (1) Fair Housing Act ("FHA"), (2) California Fair Employment and Housing Act ("FEHA"); (3) California Unruh Civil Rights Act ("Unruh Act"); (4) Unfair Business Practices; and (5) Negligence. (*See* Doc. No. 8.) The Court has federal question jurisdiction under 28 U.S.C. § 1331 and supplemental jurisdiction under 28 U.S.C. § 1367.

Defendant moves to dismiss the entire FAC under Federal Rule of Civil Procedure 12(b)(6) and contends that because Plaintiffs have failed to establish a claim upon which relief can be granted as to the FHA claim, the Court should decline to exercise supplemental jurisdiction as to the state law claims.

## II. LEGAL STANDARD

A motion to dismiss under Fed. R. Civ. P. 12(b)(6) tests the complaint's sufficiency. *See N. Star Int'l v. Ariz. Corp. Comm'n.*, 720 F.2d 578, 581 (9th Cir. 1983). A complaint may be dismissed as a matter of law either for lack of a cognizable legal theory or for insufficient facts under a cognizable theory. *Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 534 (9th Cir. 1984). In ruling on a Rule 12(b)(6) motion, the court must assume

the truth of all factual allegations and "construe them in the light most favorable to [the nonmoving party]." *Gompper v. VISX, Inc.*, 298 F.3d 893, 895 (9th Cir. 2002). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007) (internal quotation marks and citation omitted). Instead, the allegations in the complaint "must be enough to raise a right to relief above the speculative level." *Id*. at 555. To survive a motion to dismiss, plaintiffs must have "nudged their claims across the line from conceivable to plausible." *Id*. at 570.

A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). A court need not accept "legal conclusions" as true. *Iqbal*, 556 U.S. at 678. It is not proper for a court to assume that "the [plaintiff] can prove facts that [he or she] has not alleged or that defendants have violated the ... laws in ways that have not been alleged[,]" regardless of the deference shown to plaintiff's allegations. *Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983).

### III. DISCUSSION

#### A. FHA, FEHA, and Unruh Act Claims

Defendant moves to dismiss Plaintiffs' first three causes of action in the FAC arguing that Plaintiffs failed to allege any direct evidence of discriminatory intent, or indirect evidence of discrimination.

The FHA was enacted to "eradicate discriminatory practices within a division of the United States economy." *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project*,

*Inc.*, 135 S. Ct. 2507, 2511 (2015). The FHA incorporates the ideology and practices of many California statutes, including the FEHA as well as the Unruh Act. *Cabrera v. Alvarez*, 977 F. Supp. 2d 969, 975 (N.D. Cal. 2013). Each statute provides broad protection against arbitrary discrimination based on race, color, religion, sex, familial status, or national origin. *See* 42 U.S.C. § 3604(b). The provisions of the FEHA[3] and the Unruh Act[4] at issue "protect substantially the same rights as the FHA, and are subject to the same analysis." *See Cabrera*, 977 F. Supp. 2d at 975; *Walker v. City of Lakewood*, 272 F.3d 1114, 1131 n.8 (9th Cir. 2011). Thus, the Court will begin its analysis under the FHA. *See Walker*, 272 F.3d at 1131 n.8 ("Because we apply the same standards to FHA and FEHA claims, the *McDonnell Douglas* analysis applies to the FEHA claim as well.") (internal citation omitted).

Pursuant to the FHA, 42 U.S.C. § 3604(b), a claim for discrimination "against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services in connection therewith, because of race, color, religion, sex, familial status, or national origin" can be established through either disparate impact or disparate treatment theory. *Budnick v. Town of Carefree*, 518 F.3d 1109, 1114 (9th Cir. 2008); *Gamble v. City of Escondido*, 104 F.3d 300, 304–05 (9th Cir. 1997).

      *a.     Pleading standard required for FHA claims*

With respect to pleadings in discrimination cases, the Supreme Court has ruled that the survival of a complaint in a discrimination case does not rest on whether it contains

---

[3] California Government Code Section 12955(a) states that it is unlawful for "the owner of any housing accommodation to discriminate against or harass any person because of race, color, religion, sex, gender, gender identity, gender expression, sexual orientation, marital status, national origin, ancestry, familial status, source of income, disability, or genetic information of that person."

[4] The Unruh Civil Rights Act, as codified in California Civil Code Section 51(b), states: "All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, medical condition, genetic information, marital status, sexual orientation, citizenship, primary language, or immigration status are entitled to the full and equal accommodations, advantages, privileges, or services in all business establishments of every kind whatsoever."

specific facts establishing a prima facie case of discrimination. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510 (2002) ("The prima facie case under *McDonnell Douglas* . . . is an evidentiary standard, not a pleading requirement."). Thus, the ordinary rules for assessing the sufficiency of a complaint apply. *Id.* at 511 ("[U]nder a notice pleading system, it is not appropriate to require a plaintiff to plead facts establishing a prima facie case [of discrimination]"). As such, the Court must follow Federal Rule of Civil Procedure 8 to determine whether Plaintiffs sufficiently alleged Defendant intentionally discriminated against Plaintiffs because of their race.

Rule 8(a)(2) states that a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." The Court in *Twombly* ruled that "the pleading standard Rule 8 announces does not require detailed factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." 550 U.S. at 555 (internal quotation marks and citation omitted). While brevity is required, it is not enough to simply allege that a wrong has been committed and demand relief. The underlying requirement is that a pleading give "fair notice" of the claim being asserted and that "grounds upon which it rests." *Id.*

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* at 570 (internal quotation marks and citations omitted). A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* at 556.

b. *S.W.'s FHA, FEHA, and Unruh Act Claims*

The FAC alleges that Williams is African-American, but is silent as to S.W.'s race. (*See generally* Doc. No. 8.) Here, the Court cannot assume S.W.'s race and thus, cannot assume that S.W. is a member of a protected class under the FHA. *See Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983) ("*AGC*") ("It is not . . . proper to assume that [the plaintiff] can prove facts that it has not alleged"). Without facts to support S.W.'s race, the Court cannot draw a reasonable

inference that Defendant discriminated against S.W. as a result of her race. As such, S.W.'s FHA, FEHA, and Unruh Act claims must be dismissed.[5]

    c. *Williams' FHA, FEHA, and Unruh Act Claims*

Defendant's motion tends to confuse the disparate impact and disparate treatment theories. Defendant first contends "Plaintiffs does [*sic*] not appear to be making a disparate impact case, rather Plaintiffs' allegations tend to sound in a disparate treatment theory; however, Plaintiffs' pled allegations do not amount to disparate treatment." (Doc. No. 10 at 6.) Defendant continues by arguing that "Plaintiffs' allegations suggest that Defendant's enforcing of facially neutral policies amount to discrimination against her." (*Id.*) Plaintiffs did not specifically allege in the FAC under which theory of discrimination they intend to proceed. (*See generally* Doc. No. 8.) However, at the pleading stage, they are not required to do so. *See Alvarez v. Hill*, 518 F.3d 1152, 1157 (9th Cir. 2008) ("Notice pleading requires the plaintiff to set forth in his complaint *claims for relief*, not causes of action, statutes or legal theories."). The Court finds that Plaintiffs' allegations seem to be based in both theories, and therefore, finds a discussion of both theories to be appropriate and necessary.

    i. <u>Disparate Impact</u>

The Court first addresses the disparate impact theory allegation. Disparate impact occurs when a plaintiff "show[s] at least that the defendant's actions had a discriminatory effect." *Comm. Concerning Cmty. Improvement v. City of Modesto*, 583 F.3d 690, 711 (9th Cir. 2009) (internal quotation marks and citations omitted). The disparate impact theory "involve[s] practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by . . . necessity." *Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977). Further, the disparate impact theory protects people from "practices that are fair in form, but discriminatory in operation." *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971).

---

[5] At this time, the Court need not address Plaintiffs' allegation that Rzepka stared intently at S.W.

Here, only one of the instances alleged in the FAC involves a situation in which Defendant enforced a facially neutral policy. The instance occurred when Williams went into the office at the Property to use the printer. (Doc. No. 8 ¶ 13.) Plaintiffs allege Defendant has a policy which allows residents to use a printer if needed. (*Id.*) When Williams sought to do so, Rzepka asked Williams in a "quizzical, and inappropriate" tone whether Williams lived at the Property. (*Id.*). This instance is more closely aligned with a disparate impact theory, as it involves the enforcement of a facially neutral policy (the requirement that a person be a resident in order to use a printer in the office). Defendant argues that this incident "does not sound in discrimination [because] Defendant was enforcing a neutral policy by inquiring as to Williams' resident status, as tenancy was a prerequisite for printer use." (Doc. No. 10 at 6.) The Court agrees. It is not plausible to infer that Defendant's enforcement of its printing policy has a racially discriminatory effect.

### ii. Disparate Treatment

Disparate treatment occurs when "a protected group has been subjected to explicitly differential or discriminatory treatment." *Cabrera*, 977 F. Supp. 2d at 976. The FAC alleges that "Defendants . . . have engaged in a pattern or practice of discrimination against plaintiffs because of race, . . . in the operation of the Subject Property." (Doc. No. 8 ¶ 8.) The Court finds this statement to be conclusory, and thus, need not accept it as true. *See Iqbal*, 556 U.S. at 678 (finding that a court need not accept "legal conclusions" as true). However, the allegation reasonably suggests that Plaintiffs' claim appears to be based on a disparate treatment theory, as it alleges intentional discrimination because of Plaintiffs' race.

Disparate treatment claims are analyzed under the standards developed in connection with Title VII of the Civil Rights Act of 1964. *Mustafa v. Clark County Sch. Dist.*, 157 F.3d 1169, 1180 n.11 (9th Cir. 1998); *Gamble*, 104 F.3d at 304–05 (finding that courts employ a three-part burden-shifting framework as articulated in *McDonnell Douglas*). A plaintiff may succeed in persuading the court that she has been a victim of intentional

discrimination, "directly by persuading the court that a discriminatory reason more likely motivated the [defendant]." *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981). "Proof of discriminatory motive is crucial to a disparate treatment claim." *Gamble*, 104 F.3d at 305 (internal quotation marks and citations omitted). "An individual suffers disparate treatment when he or she is singled out and treated less favorably than others similarly situated on account of race." *Jauregui v. City of Glendale*, 852 F.2d 1128, 1134 (9th Cir. 2012) (internal quotation marks and citations omitted). Direct or circumstantial evidence may be used to show intentional discrimination. *Harris v. Itzhaki*, 183 F.3d 1043, 1052 (9th Cir. 1999).

At this stage, in order to proceed under a disparate treatment theory, the FAC must plausibly allege that Defendant acted with discriminatory motive. Despite its inclusion of detailed facts, there are no facts in the FAC which would allow this Court to infer that Defendant intentionally discriminated against Plaintiffs because of their race. Plaintiffs do not allege that they were treated any differently than any other resident, let alone a resident of another race. (*See generally* Doc. No. 8.)

There are only three specific incidents described in the FAC in which race was either directly or indirectly addressed. The first incident occurred when during a conversation between Rzepka and Williams, "Rzepka asked Williams in an odd way, 'What kind of name is that?'" (Doc. No. 8 ¶ 14.) Williams "responded in a friendly tone, 'A black name.'" (*Id.*) While the Rzepka's question may have been distasteful, distasteful comments do not necessarily rise to the level of direct evidence of discrimination. *See Hadeed v. Abraham*, 265 F. Supp. 2d 614, 622 (E.D. Va. 2003), *aff'd*, 103 Fed. Appx. 706 (4th Cir. 2004) (holding that defendant's reference to the plaintiffs as "the girls" in gender-based FHA case "may be distasteful, but it does not rise to the level [of direct evidence] of discrimination"). The first incident addressed here is not direct evidence of discriminatory intent.

The second incident occurred when Rzepka stated "[t]his is not the ghetto" when explaining why Williams' car was towed. (*Id.* ¶ 16.) The Eighth Circuit has held that a defendant's statement is not direct evidence of defendants' illegal intent unless it shows "a

specific link between the alleged discriminatory animus and the challenged decision." *Gallagher v. Magner*, 619 F.3d 823, 831–32 (8th Cir. 2010) (direct evidence does not include "stray remarks . . ., statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself"). If this Court were to follow the standard outlined by the Eighth Circuit, Rzepka's statement that "This is not the ghetto" *might* be considered direct evidence of discriminatory, as it could reasonably be inferred that the statement was made by a decisionmaker in relation to the decisional process of whether to tow the vehicle. Rzepka was the manager of the Property and made the comment to Williams when explaining why the car was towed. In their opposition, Plaintiffs argue that "[a] reasonable jury could readily ascribe the use of the word 'ghetto' to an African-American as racial in nature." (Doc. No. 13 at 5.) However, the FAC does not allege this contention. *See AGC*, 459 U.S. at 526 ("It is not . . . proper to assume that [the plaintiff] can prove facts that it has not alleged"); *see also Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007) ("In ruling on a 12(b)(6) motion, a court may generally consider only allegations contained in the pleadings.").

The third occurred when one of the repairmen said to Williams: "'Don't say anything, but your manager was talking very negatively about you. She doesn't like you. She told us that you are black, and you'll go off on her. She told us to watch-out.'" (Doc. No. 8 ¶ 27.) The third instance is the most persuasive fact that *might* lead to a showing of racially motivated intent by Defendant; however, standing alone, this comment is insufficient for the Court to infer that the actions taken by Defendant were racially motivated.

These three instances alone, coupled with Plaintiffs' failure to allege they were treated differently than others similarly situated, do not support an inference of discrimination disparate treatment theory above the speculative level as required by Rule 8. *See Twombly*, 550 U.S. at 555.

Plaintiffs next contend that Defendant discriminated against Plaintiffs by conducting an irregular inspection of Plaintiffs' home on September 27, 2018. (Doc. No. 13 at 5–6.)

13

3:19-cv-00691-AJB-AHG

Plaintiffs allege Defendant deceived Plaintiffs as to the purpose of the inspection. (Doc. No. 8 ¶¶ 18–20.) Plaintiffs contend this instance was "apparent retaliation" for Williams' complaining about her car being towed. (Doc. No. 13 at 6.) Thus, this allegation should be analyzed under a disparate treatment theory as it is based on the premise that Rzepka acted intentionally. Plaintiffs' allegation that the instance was "apparent retaliation" is too bare and conclusory to be "entitled the assumption of truth." *See Iqbal*, 556 U.S. at 678–79, 681. Upon learning of the inspection, Williams emailed Trinh and informed her that she did not feel safe with Rzepka there and felt that Rzepka was harassing them. (Doc. No. 8 ¶ 20.) On October 1, 2018, Trinh responded to Plaintiff via email, and offered to allow Plaintiffs to move out without any penalties or turnover charges. (Doc. No. 8 ¶ 21.) In their opposition, Plaintiffs argue "[t]his 'offer' to move out was the culmination of Ms. Rzepka's shaded racial attitudes, and retaliatory conduct related thereto." (Doc. No. 13 at 6.) However, this contention is unsupported by the allegations made in the FAC. Defendant notes that the FAC shows that Williams was generally combative and aggressive with Rzepka. (*See* Doc. No. 8 ¶¶ 14, 19, 20.) The Court agrees. Even if a plaintiff alleges facts consistent with illegal behavior, if there is an "obvious" and legal alternative for the conduct, the facts alleged by plaintiff will not "plausibly establish" the improper purpose. *See Iqbal*, 556 U.S. at 682 (holding that an allegation that plaintiff's arrest was the result of unlawful discrimination against Muslim men was *not* "plausible" in view of more likely explanation for arrest).

Here, it is plausible that Defendant's October 1, 2018 offer to allow Plaintiffs to move out without a penalty was as a result of Plaintiffs' discontent with the Property's management, fear for their safety, and feeling that they were being harassed by Rzepka. Thus, it is not plausible, based on the face of Plaintiffs' complaint, that the inspection or Defendant's subsequent offer to allow Plaintiffs to move out was a violation of the FHA. *See Swartz*, 476 F.3d at 763 ("In ruling on a 12(b)(6) motion, a court may generally consider only allegations contained in the pleadings."). Additionally, there are no allegations to support that this behavior was selectively conducted against anyone else,

regardless of race. Thus, it is not plausible that this incident was a result of disparate treatment.

Lastly, on April 9, 2019, after several months of no contact, Defendant sent Williams a 60-day notice to terminate Plaintiffs' tenancy, indicating that Williams would be evicted if she did not comply with the Notice of Termination. (Doc. No. 8 ¶ 30.) When asked the reason for the Notice of Termination, Trinh refused to provide a reason and stated that "it was up to the team's discretion" about whether to renew a lease. (*Id.*) Williams responded that she did not do anything wrong and believed that harassment was forcing her to move. (*Id.*) Trinh responded that she did not believe Williams had done anything wrong, but believed it was best as Williams did not seem satisfied with her residency. (*Id.*) Plaintiffs contend "[a] reasonable jury could readily find that a landlord evicting a tenant who always paid her rent on time, and who admittedly had done nothing wrong, was being removed due to Ms. Rzepka's dislike of her, which dislike was clearly tinged with racial attitudes." (Doc. No. 13 at 8.) Even viewed in a light most favorable to Plaintiffs, it is implausible that the Notice of Termination was a based on discriminatory intent.

A complete reading of the FAC shows that over the course of Plaintiffs' tenancy, the relationship between Plaintiffs and Defendant significantly deteriorated. (*See generally* Doc. No. 8.) Plaintiffs' own admissions undermine their claim of discriminatory intent. The FAC alleges several instances in which Williams acted with hostility towards Rzepka, Trinh, and various other employees. (*Id.*) As discussed above, allegations of wrongdoing will be deemed "implausible" if there are "obvious alternative explanation[s]" for the facts alleged indicating lawful conduct, not the unlawful conduct urged by the plaintiff. *Iqbal*, 556 U.S. at 682. Here, the deterioration of the relationship between Plaintiffs and Defendant is an obvious, alternative, and legal explanation for the termination of Plaintiffs' tenancy. Thus, the Court must find that Plaintiffs' FHA cause of action, as well as their FEHA and Unruh Act claims, fail under a disparate treatment theory. Accordingly, the Court **GRANTS** Defendant's motion to dismiss as to the FHA, FEHA, and Unruh Act claims.

### B. Supplemental Jurisdiction Over UCL and Negligence Claims

In addition to the claims discussed above, Plaintiffs claim Defendant violated the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et. seq*. ("UCL") by engaging in unfair business practices. (Doc. No. 8 ¶ 43.) Additionally, Plaintiffs claim Defendant were negligent in operating the Property free from unlawful discrimination. (*Id.* ¶ 45.)

The Court acquired original subject matter jurisdiction over this action because Plaintiffs alleged a federal claim of an FHA violation. *See* 28 U.S.C. § 1331. The Court "has supplemental jurisdiction over all other claims that are so related to claims in the action within . . . original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. §1367(a). "A state law claim is part of the same case or controversy when it shares a 'common nucleus of operative fact' with the federal claims and the state and federal claims would normally be tried together." *Bahrampour v. Lampert*, 356 F.3d 969, 978 (9th Cir. 2004). Defendant does not contend that the state law claims do not form part of the same case or controversy, as all claims are based on the same facts. Therefore, the Court has supplemental jurisdiction over the state law claims.

Defendant moves the Court to exercise its discretion under §1367(c) to decline to exercise supplemental jurisdiction. "The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . (3) the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. §1367(c). As discussed above, Plaintiffs' federal FHA is dismissed. As such, the claim under which the Court had original jurisdiction is dismissed. Thus, the Court has discretion to decline to exercise supplemental jurisdiction over Plaintiffs' state law claims. Here, the Court finds it appropriate to dismiss Plaintiffs' state law claims, without prejudice, as a result of dismissal of the FHA claim. *See Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1998) ("when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by

dismissing the case without prejudice"); *see also United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966) ("if the federal claims are dismissed before trial, even though no insubstantial in a jurisdictional sense, the state claims should be dismissed as well."). Thus, the Court **GRANTS** Defendant's motion to dismiss Plaintiffs' UCL and negligence claims.

### C. Leave to Amend

The Court next considers whether to grant leave to amend. "The court should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). The Court has "broad discretion in deciding whether to grant leave to amend and whether to dismiss an action with or without prejudice." *WPP Lux. Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1058 (9th Cir. 2011), *overruled in part*, *Lorenzo v. SEC*, 139 S. Ct. 1094, 1100 (2019). "[C]ourts are only required to grant leave to amend if a complaint can possibly be saved." *Lopez v. Smith*, 203 F.3d 1122, 1129 (9th. Cir. 2000) (internal quotation marks and citations omitted). With sufficient pleadings, the Court finds it is possible for Plaintiffs to allege that Defendant discriminated against them on the basis of race. Thus, the Court **GRANTS** Plaintiffs leave to amend.

### III. CONCLUSION

For the reasons stated above, the Court **GRANTS** Defendant's motion to dismiss **WITH LEAVE TO AMEND**. Plaintiffs must file an amended complaint by **thirty (30) days** from the date of this Order.

**IT IS SO ORDERED.**

Dated: February 26, 2020

Hon. Anthony J. Battaglia
United States District Judge